UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
JASON SMALLS,

                Plaintiff,

      - against -

THE NEW YORK HOSPITAL MEDICAL
CENTER OF QUEENS, and DARLENE
MERCIECA as an aider and abettor,

               Defendants.

-----------------------------------------------------------X

**<u>MEMORANDUM AND ORDER</u>**
13-CV-1257 (RRM) (CLP)

ROSLYNN R. MAUSKOPF, United States District Judge.

      Plaintiff Jason Smalls sued his employer, defendant The New York Hospital Medical

Center of Queens ("NYHQ" or the "Hospital"), and supervisor, defendant Darlene Mercia,

alleging that they discriminated against him on the basis of his race and retaliated against him

when he reported the discrimination. Defendants move for summary judgment on all claims.

For the reasons set forth below, defendants' motion is granted.

## BACKGROUND[1]

      Plaintiff, an African-American man, began working as a *per diem* paramedic at the

Hospital in March of 1999. (Pl. Rule 56.1 Counter Statement (Doc. No. 40-2) at ¶¶ 6, 11.) On

January 2, 2002, he was promoted to full-time paramedic, and on April 7, 2009, he was

promoted to Assistant Supervisor of the Emergency Medical Services ("EMS") Department. (*Id.*

at ¶¶ 7, 10.) Like all new Assistant Supervisors (whether newly hired or promoted) plaintiff was

placed on a probationary period after he was hired. (*Id.* at ¶ 16[2]; Decl. of Lorraine Orlando

---

[1] The following facts are undisputed unless otherwise noted and taken in the light most favorable to plaintiff. *See Giannullo v. City of New York*, 322 F.3d 139, 140–41 (2d Cir. 2003).

[2] Here, and elsewhere throughout his Rule 56.1 Counter Statement, plaintiff "disputes the alleged statement of fact contained within [the above] paragraph [] of Defendants' 56.1 Statement." (*See* Pl. Rule 56.1 Counter Statement at

("Orlando Decl.") (Doc. No. 43) at ¶ 18.) In this new position, plaintiff worked with Peter Kwiath, a Caucasian man and the only other Assistant Supervisor in the EMS Department at the time, and reported directly to Madeline Fong, the EMS Supervisor. (Pl. Rule 56.1 Counter Statement at ¶¶ 12, 17.) [3] Fong was supervised by defendant Mercieca, who was employed as the Administrative Director for Emergency Medicine at the Hospital beginning in May of 2009. (*Id.* at ¶ 24; Declaration of Darlene Mercieca ("Mercieca Decl.") (Doc. No. 42) at ¶ 4.)

As an Assistant Supervisor in the EMS Department, plaintiff supervised EMTs and paramedics and was responsible for preparing and implementing department schedules, ensuring adequate staffing and shift coverage, maintaining the ambulance base, and managing payroll, billing, quality assurance, and supplies, among other tasks. (Pl. Rule 56.1 Counter Statement at ¶ 14.) Plaintiff and Kwiath worked different shifts as Assistant Supervisors – plaintiff worked from 5:00 a.m.–1:00 p.m., while Kwiath worked from 3:00 p.m.–11:00 p.m. or from 4:00 p.m.– midnight.[4] (*Id.* at ¶ 15.)

On May 20, 2009, before plaintiff finished his probationary period, Fong placed him on a Performance Improvement Plan ("PIP") – a common tool used to help educate and train Hospital employees. (*Id.* at ¶ 18.) The only negative comment in plaintiff's PIP is Fong's note in the "Scheduling" section that plaintiff "needs more practice on filling vacancies." (Orlando Decl. at Ex. H.) Fong filled out another PIP two weeks later, noting that plaintiff still needed to "perform [his] scheduling responsibilities alone." (*Id.* at Ex. I.) He also mentioned continuing issues with

---

¶ 18.) However, the purpose of Rule 56.1 is to consolidate the facts existing elsewhere in the record for the benefit of the Court's review. Neither a Statement nor a Counter-Statement submitted pursuant to Rule 56.1 is itself evidence, and plaintiff's cursory denial does not create a genuine issue of material fact where one does not otherwise exist based on evidence in the record.

[3] Plaintiff does not dispute that Fong was his supervisor.

[4] For a short time immediately after he was promoted, plaintiff worked from 11:00 p.m. – 7:00 a.m. (Pl. Rule 56.1 Counter Statement at ¶ 15.)

plaintiff's scheduling on the ensuing three PIPs.[5]  (*Id.*)  On November 13, 2009, plaintiff's probationary period was extended for an additional three months.  (Pl. Rule 56.1 Counter Statement at ¶ 22.)  The reason given was that plaintiff struggled with disciplining his former colleagues and holding them accountable, acting more as "one of the guys" than as a supervisor.[6] (Orlando Decl. at Ex. J at NYHQ 097.)  Plaintiff claims that after a billing meeting in either 2009 or 2010, at which Fong was present, Mercieca said to him "let's call a spade a spade."  (Pl. Rule 56.1 Counter Statement at ¶ 83.)

In 2010, Fong left the Hospital and plaintiff began reporting directly to Mercieca.  (*Id.* at ¶ 25.)  Soon after Fong's departure, Mercieca met with plaintiff and Kwiath to reorganize responsibilities within the EMS Department in order to account for Fong's departure.  (*Id.* at ¶ 26.)  As a result of this meeting, plaintiff and Kwiath shared responsibility for scheduling and completing narcotics paperwork, plaintiff was solely responsible for payroll and primarily responsible for inventory, and Kwiath was primarily responsible for completing statistics and reviewing unit activity logs.  (*Id.* at ¶¶ 28, 29.)  Plaintiff consistently describes his responsibilities as "more significant" than those of Kwiath, specifically citing the fact that payroll was a task that "required a few hours each week to complete."  (*Id.*)  Plaintiff also claims that he was permitted to attend Fire Department of New York ("FDNY") quarterly meetings with approval when Fong was his supervisor, but after Mercieca became his supervisor, she told him that attending these meetings was not part of his role.  (*Id.* at ¶ 85.)

In plaintiff's October 31, 2010 evaluation form Mercieca describes him as "a pleasure to

---

[5] As plaintiff notes, there is no notation regarding any scheduling issues on the PIP dated August 6, 2009.  (*Id.* at Ex. I.)  No other issues are noted on the PIPs.  (*Id.*)

[6] Though Fong is still listed as plaintiff's supervisor on the form, Mercieca signed the form and supplied the reasons for the extension.  (Orlando Decl. at Ex. J at NYHQ 097.)

have on staff," says that he took on increased responsibility "with a smile," and learned a new system so well he could serve as a "resource for the staff." (*Id.* at ¶ 32; Mercieca Decl. at Ex. At at NYHQ 074.) The two areas Mercieca highlights for improvement are plaintiff's continued issues with distinguishing "between friends who are staff and his role in management," and the importance of plaintiff collaborating better with other EMS management when handling issues for the first time. (*Id.* at NYHQ 074–75.) Ultimately, she noted that he was "an asset to me and the department," and that she was "happy to have Jason as part of my team and look[ed] forward to his development in his role." (*Id.*)

In December 2010, Mercieca walked into the ambulance base where she found plaintiff and one of the paramedics ("C.W."), who was working on a computer after the end of his shift.[7] (Pl. Rule 56.1 Counter Statement at ¶ 38.) Later, Mercieca checked the Hospital's electronic time-keeping system and discovered that C.W. was still clocked in even though his shift had ended. (*Id.* at ¶ 39.) She then audited C.W.'s time records and pay, and found that he had been consistently paid for unauthorized overtime recorded after the end of his shift, but there was no evidence that any work was performed. (*Id.* at ¶ 40.) When Mercieca questioned plaintiff about these records, he told her that he had not reviewed the time records before approving the overtime because he was "too busy," and stated further that he probably overpaid a lot of employees as a result. (*Id.* at ¶ 41; Mercieca Decl. at Ex. C at NYHQ 118.)

After an investigation of several months, Mercieca concluded that plaintiff had failed to properly review time records, review and approve overtime requests, and take action to address unauthorized overtime, resulting in his continuous approval of overtime payments to C.W. for

---

[7] Mercieca testified that she asked plaintiff what C.W. was doing, and plaintiff responded "he's doing his homework." (Mercieca Decl. at ¶ 28; Dep. of Darlene Mercieca (Doc. No. 43-5) ("Mercieca Dep.") at 81.) In contrast, plaintiff testified that he did not recall ever seeing C.W. doing homework at the ambulance base. (Dep. of Jason Smalls (Doc. No. 40-4) ("Pl. Dep.") at 95.)

time not worked.  (Pl. Rule 56.1 Counter Statement at ¶ 42.)  Plaintiff was then suspended for one day on May 12, 2011.  (*Id.* at ¶ 43.)  Defendants contend that plaintiff was suspended for the unauthorized overtime payments, but plaintiff states Mercieca accused him of being "in cahoots" with C.W. (who was also African-American) to "steal time" from the hospital, and suspended him accordingly.  (*Id.* at ¶ 43; Dep. of Jason Smalls (Doc. No. 40-4) ("Pl. Dep.") at 155.)  Plaintiff complained to two doctors, Dr. Walderon and Dr. Sixsmith, about this event.  (*Id.* at ¶¶ 96–100; Pl. Dep. at 230–31), though plaintiff testified that he does not recall telling these doctors that he was being discriminated against because of his race.  (Pl. Dep. at 231.)

Plaintiff's performance issues continued.  On December 7, 2011, he received an email from a paramedic raising serious performance-related concerns about another paramedic, and while plaintiff claims to have notified the Medical Director about the issue, he did not alert either Kwiath or Mercieca, and they did not learn of the issue until more than a month had passed.  (Pl. Rule 56.1 Counter Statement at ¶¶ 49–51.)  In January 2012, plaintiff did not follow proper procedure regarding an employee's extended absence from work, and as a result, the employee was paid incorrectly.  (*Id.* at ¶ 52.)  Plaintiff also failed to follow up with employees who were late.  (Mercieca Decl. at Ex. C at NYHQ 118.)  On March 29, 2012, plaintiff received an "unsatisfactory" rating on his annual performance evaluation ("March 29 Evaluation"), which cited his "inability to separate his roles as supervisor and friend to the staff," his suspension for overpayment, his failure to address lateness issues, and his failure to follow and enforce NYHQ policy.  (*Id.*; Pl. Rule 56.1 Counter Statement at ¶ 53.)  Around this same time, during a meeting between plaintiff and Mercieca, Mercieca told him that they planned to hire a new Operations Manager to work from 8:00 a.m.– 4:00 p.m. and that she did not know what the Hospital would do with plaintiff.  (Pl. Rule 56.1 Counter Statement at ¶¶ 96–100; Pl. Dep. at 197.)  Plaintiff took

this as a "taunt" that whomever the Hospital hired to fill this position would replace him. (Pl. Rule 56.1 Counter Statement at ¶¶ 96–100.)

Soon after the March 29 Evaluation, plaintiff sent Merceica a request for confirmation of his impending vacation plans. (*Id.* at ¶¶ 87–88.) This request was not answered in a timely fashion, and plaintiff missed his flight to Texas.

In April 2012, plaintiff and Kwiath were responsible for a scheduling error that resulted in significant understaffing. (Pl. Rule 56.1 Counter Statement at ¶¶ 59, 60.) Merceica spoke with both of them about their failure to ensure sufficient coverage and their granting of excess vacation leave requests. (*Id.* at ¶¶ 59–62.) Kwiath was given a verbal warning, and this error was noted in his 2012 evaluation, but he was not put on a PIP. (*Id.* at ¶ 63; Merceica Dep. (Doc. No. 40-5) at 102; Pl. Dep. at 108–09.) Plaintiff alleges that during this meeting, or at another scheduling meeting in April 2012 at which both he and Kwiath were present, Merceica said, "I don't know what's wrong with you people." (Pl. Dep. at 136–38.)

Plaintiff continued to grant vacation requests above permissible levels, and Merceica placed plaintiff on a PIP on May 8, 2012 ("May 8 PIP").[8] (Pl. Rule 56.1 Counter Statement at ¶ 64; Merceica Decl. at Ex. F at NYHQ 054-055.) In addition to citing plaintiff's failure to properly manage vacation requests, the May 8 PIP states that plaintiff failed to properly supervise staff and failed to inform staff of NYHQ policies. (Merceica Decl. at Ex. F at NYHQ 054.) The PIP encouraged plaintiff to attend classes for first-time supervisors, and indicated that he would be monitored on a monthly basis to track improvement, and that plaintiff and Merceica

---

[8] While plaintiff "disputes the alleged statement of fact" here, he simply uses the same stock paragraph that he used in response to paragraphs 59–67. Though that stock paragraph provides detailed objections and averments, it does not include a denial of the claim that he continued to grant excessive vacation requests. Because it is contained in the sworn declaration of Merceica, is further supported by the PIP in question, and is not specifically denied, the Court deems this fact admitted.

would meet every month for the ensuing three months to "evaluate his improvement and performance." (*Id.*) Lastly, it notes that "[l]ack of improvement will result in suspension, and/or termination." (*Id.* at NYHQ 055.) Mercieca followed up with plaintiff on June 14, 2012, and discovered that he had not yet completed the training. (Pl. Rule 56.1 Counter Statement at ¶ 67.)

Plaintiff met with Lorraine Orlando on May 11, 2012. (*Id.* at ¶ 91.) During that meeting, plaintiff claims that they discussed "the staff thing about getting a union," Mercieca's treatment of him and Kwiath, and his previous one-day suspension. (*Id.* at ¶ 91; Pl. Dep. at 128–130.) Orlando states that plaintiff did not complain of racial discrimination or harassment during this meeting, but rather they spoke about "issues relating to the staff under his supervision and he asked a question about the salary for his own job title." (Orlando Decl. at ¶¶ 41–42.) Plaintiff is unable to recall any of the particulars of the meeting. (Pl. Dep. at 128–130.)

After his negative performance evaluation, plaintiff began looking for another position, and he received a written offer of employment from New York-Presbyterian/Weill Cornell Medical Center on July 2, 2012. (Pl. Rule 56.1 Counter Statement at ¶ 69; Pl. Dep. at 206.) On August 1, 2012, plaintiff submitted a letter of resignation, stating that September 6, 2012 would be his last day of employment. (Pl. Rule 56.1 Counter Statement at ¶ 70.) Plaintiff began taking sick leave on August 27, 2012, and did not return to work again. (*Id.* at ¶ 75.)

Plaintiff filed his Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") on June 14, 2012, and defendants received the Notice of the charge on September 4, 2012. (*Id.* at ¶ 101.) The EEOC mailed plaintiff the Notice of Right to Sue on January 17, 2013. (Compl. (Doc. No. 1) at Ex. A.) Plaintiff commenced this lawsuit on March 8, 2013, and defendants filed their fully briefed motion for summary judgment on September 19, 2014.

**DISCUSSION**

**A. <u>Standard of Review</u>**

Summary judgment may be granted when the pleadings, the discovery and disclosure materials on file, and any affidavits demonstrate that there are no genuine issues of material fact in dispute and that the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Salahuddin v. Goord*, 467 F.3d 263, 272 (2d Cir. 2006). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Savino v. City of New York*, 331 F.3d 63, 71 (2d Cir. 2003). In deciding whether a genuine issue of material fact exists as to an essential element, the Court must draw all reasonable inferences and resolve all ambiguities in the nonmoving party's favor, and construe the facts in the light most favorable to the nonmoving party. *Id.* at 254–55. Summary judgment may also be appropriate "if the nonmovant fails to make a showing sufficient to establish the existence of an element essential to [his] case," on which "the nonmoving party bears the burden of proof at trial." *Nebraska v. Wyoming*, 507 U.S. 584, 590 (1993) (quoting *Celotex*, 477 U.S. at 322) (internal quotation marks omitted); *Abramson v. Pataki*, 278 F.3d 93, 101 (2d Cir. 2002). To defeat defendants' motion for summary judgment, plaintiff must offer "concrete evidence from which a reasonable juror could return a verdict in his favor," *Anderson*, 477 U.S. at 256, and "may not rely on conclusory allegations or unsubstantiated speculation." *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998).

**B. <u>Discrimination Under Title VII, SHRL and CHRL</u>**

Plaintiff alleges that the Hospital discriminated against him because of his race, in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), the New York State Human

Rights Law ("SHRL"), and the New York City Human Rights Law ("CHRL").[9]  Discrimination

claims brought under Title VII and the SHRL are identical – the same standard of proof applies

to both statutes, and both are analyzed under the burden-shifting scheme set forth in *McDonnell*

*Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973).  *See Tolbert v. Smith*, 790 F.3d 427, 434

(2d Cir. 2015); *Rojas v. Roman Catholic Diocese of Rochester*, 660 F.3d 98, 107 n.10 (2d Cir.

2011).  Under that scheme, the plaintiff bears the initial burden of making out a *prima facie* case

of discrimination by showing that: (1) he is a member of a protected class; (2) he was qualified

for his position; (3) he was subject to an adverse employment action; and (4) the adverse

employment action occurred under circumstances giving rise to an inference of discrimination.

*Joseph v. Leavitt*, 465 F.3d 87, 90 (2d Cir. 2006).[10]

Claims brought under the CHRL must be analyzed separately.  *Mihalik v. Credit Agricole*

*Cheuvreux N. Am., Inc.*, 715 F.3d 102, 109, 113 (2d Cir. 2013).  The CHRL must be construed

"broadly in favor of discrimination plaintiffs," even when such protection is not available under

federal or state law.  *Albunio v. City of New York*, 16 N.Y.3d 472, 477–78 (2011); *Benson v. Otis*

*Elevator Co.*, 557 F. App'x 74, 76 (2d Cir. 2014).  Under the CHRL, the plaintiff

> need only show that [his] employer treated [him] less well, at least in part for a
> discriminatory reason.  The employer may present evidence of its legitimate,
> nondiscriminatory motives to show the conduct was not caused by discrimination,
> but it is entitled to summary judgment on this basis only if the record establishes as
> a matter of law that 'discrimination played no role' in its actions.

---

[9] While plaintiff asserts Title VII claims of discrimination and retaliation against both the Hospital and Mercieca,
there can be no individual liability under Title VII.  *See Lore v. City of Syracuse*, 670 F.3d 127, 169 (2d Cir. 2012);
*Patterson v. County of Oneida, N.Y.*, 375 F.3d 206, 221 (2d Cir. 2004).  The Court therefore considers these claims
only against the Hospital, and dismisses the Title VII claims against Mercieca.

[10] If the plaintiff can establish a *prima facie* case, the burden shifts to the employer to offer a legitimate, non-
discriminatory reason for the adverse employment action; if such reasons are offered, the burden then shifts back to
the plaintiff to demonstrate that the employer's reasons are pretextual.  *Garcia v. Hartford Police Dep't*, 706 F.3d
120, 127 (2d Cir. 2013).

*Mihalik*, 715 F.3d at 110 (quoting *Williams v. N.Y.C. Hous. Auth.*, 872 N.Y.S.2d 27, 40 n.27 (1st Dep't 2009). Summary judgment may not be granted under this statute unless "no jury could find defendant[s] liable under any of the evidentiary routes – *McDonnell Douglas*, mixed motive, direct evidence, or some combination thereof." *Bennett v. Health Mgmt. Sys., Inc.*, 936 N.Y.S.2d 112, 114 (1st Dep't 2011); *see also Melman v. Montefiore Med. Ctr.*, 946 N.Y.S.2d 27, 30 (1st Dep't 2012). However, where a plaintiff is unable to raise a triable issue of fact, summary judgment on claims under all three statutes is appropriate. *See Simmons v. Akin Gump Strauss Hauer & Feld, LLP*, 508 F. App'x 10, 14 (2d Cir. 2013).

## 1. Adverse Employment Actions

There is no dispute here that plaintiff is a member of a protected class, and defendants do not argue that plaintiff was not qualified for his position. Plaintiff's *prima facie* case therefore turns first on whether he can establish that he suffered an adverse employment action. "A plaintiff sustains an adverse employment action if he or she endures a materially adverse change in the terms and conditions of employment." *Brown v. City of Syracuse*, 673 F.3d 141, 150 (2d Cir. 2012). An adverse employment action is "more disruptive than a mere inconvenience or an alteration of job responsibilities." *Id.* (citing *Joseph*, 465 at 90); *Galabya v. New York City Bd. of Ed.*, 202 F.3d 636, 640 (2d Cir. 2000); *see also Tolbert*, 790 F.3d at 435; *Littlejohn v. City of New York*, No. 14-CV-1395, 2015 WL 4604250, at *8 n.10 (2d Cir. Aug. 3, 2015). "A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation." *Galabya*, 202 F.3d at 640 (citing *Crady v. Liberty Nat'l Bank & Trust Co.*, 993 F.2d 132, 136 (7th Cir. 1993)).

As a preliminary matter, the law is clear that neither prohibiting plaintiff from attending the FDNY meetings nor denying his vacation request constitute adverse employment actions. *See Dillon v. Morano*, 497 F.3d 247, 254–55 (2d Cir. 2007) (finding that exclusion from certain meetings, without consequential negative consequences, did not constitute an adverse employment action); *Kurian v. Forest Hills Hosp.*, 962 F. Supp. 2d 460, 470 (E.D.N.Y. 2013) (collecting cases stating the same); *Weber v. City of New York*, 973 F. Supp. 2d 227, 252 (E.D.N.Y. 2013) (collecting cases stating that denial of vacation time is not an adverse action).

The Court will address in greater detail plaintiff's claims that he suffered five additional adverse employment actions: (1) an unfair division of responsibilities between plaintiff and Kwiath; (2) plaintiff's annual evaluations; (3) his placement on the May 8 PIP; (4) his constructive discharge; and (5) plaintiff's one-day suspension.[11]

### i. Division of Responsibilities

After Fong left, Mercieca divided EMS Department responsibilities between plaintiff and Kwiath, and assigned plaintiff to be in charge of payroll. Plaintiff argues that handling payroll was "a significant task requiring a few hours each week to complete," (Pl. Mem. in Opp'n at 12), and cites *Edwards v. Huntington Union Free Sch. Dist.* for the proposition that the "assignment of a disproportionately heavy workload can constitute an adverse employment action." 957 F. Supp. 2d 203, 211 (E.D.N.Y. 2013) (internal quotation marks and citation omitted).

However, "changes in assignments or duties that do not radically change the nature of work are not typically adverse employment actions." *Weisbecker v. Sayville Union Free Sch.*

---

[11] Plaintiff also maintains that when he was promoted to Assistant Supervisor, "he was informed by his supervisor that his salary would be based on a senior paramedics pay and, as such, he was paid less than Mr. Kwiath." (Pl. Mem. in Opp'n (Doc. No. 40-14) at 11–12.) However, neither of the depositions plaintiff cites to support this point; rather, the record evidence demonstrates that plaintiff was paid exactly the same salary as Kwiath. (*See* Orlando Decl. at Ex. L and Ex. M.)

*Dist.*, 890 F. Supp. 2d 215, 233 (E.D.N.Y. 2012) (citing *Galabya*, 202 F.3d at 641). For the

assignment of a heavy workload to constitute an adverse employment action, "a plaintiff must

show a material change" resulting therefrom. *Edwards*, 957 F. Supp. 2d at 211 (citing *Carter v.*

*New Venture Gear, Inc.*, 310 F. App'x 454, 457 (2d Cir. 2009); *see also Grant v. United*

*Cerebral Palsy of N.Y.C., Inc.*, No. 11-CV-0018, 2014 WL 902638, at *7 (S.D.N.Y. Mar. 7,

2014) (finding that allegations that defendant discriminatorily increased plaintiff's workload do

not qualify as materially adverse changes in the terms and conditions of employment) (citing

*Henriquez v. Times Herald Record*, 165 F.3d 14 (2d Cir. 1998)).

In *Edwards*, the court found no adverse employment action where the employee was

required to teach two classes in addition to his administrative duties but his title and salary

remained the same. *Id.* at 211–12. Similarly, here, plaintiff's salary and title did not change, and

requiring him to spend a few hours per week managing the payroll did not radically change the

nature of his work, nor did it materially alter the terms and conditions of his employment.[12] As a

result, it does not constitute an adverse employment action.

### ii. Negative Evaluations

Next, plaintiff claims that his 2009 evaluation caused Mercieca to extend his initial

probationary period, and that the March 29, 2012 evaluation led him to believe he would be

terminated, causing his constructive discharge. While negative reports or evaluations alone are

generally not adverse employment actions, "they can be considered adverse employment actions

when they give rise to material adverse changes in work conditions." *Bowen-Hooks v. City of*

*New York*, 13 F. Supp. 3d 179, 217 (E.D.N.Y. 2014) (citing *Hill v. Rayboy-Brauestein*, 467 F.

---

[12] Plaintiff also argues that this division of responsibilities caused his suspension and should therefore be considered an adverse action, as he was suspended for a payroll-related matter. This argument is plainly meritless – it was not the division of responsibilities that itself caused his suspension, but plaintiff's failure to review the time records before approving overtime payments. (*See* Rule 56.1 Counter Statement at ¶ 41–42.)

Supp. 2d 336, 351 (S.D.N.Y. 2006) (internal quotation marks omitted); *see Jantz v. Emblem Health*, No. 10-CV-6076, 2012 WL 370297, at *9 (S.D.N.Y. Feb. 6, 2012); *cf. Farina v. Branford Bd. of Educ.*, 458 F. App'x 13, 17 (2d Cir. 2011) (finding no adverse employment action where negative evaluations had no effect on the terms and conditions of employment).

First, the 2009 evaluation and ensuing three-month extension of a probationary period did not materially affect the terms and conditions of plaintiff's employment. Every new Assistant Supervisor is placed on probation, and though his probationary period was extended, plaintiff was still paid the same amount, retained the same title, worked the same hours, and held generally the same amount of responsibility while on probation. Moreover, there were no negative consequences because of this extension – it "merely preserved the existing terms of [plaintiff's] employment." *Smith v. Da Ros*, 777 F. Supp. 2d 340, 355 (D. Conn. 2011) (finding that an extension of probation did not constitute an adverse employment action where an automatic 60-day initial probation period was extended by 30 days without any negative consequences); *cf. Tolbert*, 790 F.3d at 436 (finding that while extending a probationary period by one year may not qualify as an adverse employment action, it does so qualify when it is coupled with the denial of tenure); *Benedith v. Malverne Union Free Sch. Dist.*, 38 F. Supp. 3d 286, 325 (E.D.N.Y. 2014) (collecting cases and noting that to qualify as an adverse employment action, excessive scrutiny must be accompanied by unfavorable consequences). Plaintiff's 2009 evaluation therefore does not constitute an adverse employment action.

Plaintiff's claim that the 2011 evaluation caused his constructive discharge also fails.[13]

---

[13] As explained below, "[c]onstructive discharge of an employee occurs when an employer, rather than directly discharging an individual, intentionally creates an intolerable work atmosphere that forces an employee to quit involuntarily." *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 73 (2d Cir. 2000). A claim of constructive discharge "must be dismissed as a matter of law unless the evidence is sufficient to permit a rational trier of fact to infer that the employer deliberately created working conditions that were so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." *Murray v. Town of N.*

The evaluation itself did not cause any plaintiff to suffer any negative consequences, nor did it materially change the terms and conditions of his employment – he was paid the same, retained the same title, and worked the same hours doing the same tasks as before. Critically, receiving a negative evaluation is insufficient to sustain a constructive discharge claim. *See Rozenfeld v. Dep't of Design & Const. of City of New York*, 875 F. Supp. 2d 189, 204 (E.D.N.Y. 2012); *Nicholls v. Philips Semiconductor Mfg.*, 760 F. Supp. 2d 407, 417 (S.D.N.Y. 2011) (finding a plaintiff's theory of constructive discharge insufficient where it was based on "unfairly negative performance evaluations" among other alleged actions); *see also Alfieri v. SYSCO Food Services-Syracuse*, 192 F. Supp. 2d 14, 24 (S.D.N.Y. 2001) (holding that employee was not compelled to resign for constructive discharge purposes where she feared she would be terminated in the future if her performance did not improve, even where criticism of her work was allegedly frequent and unjustified); *Bennett v. Watson Wyatt & Co.*, 136 F. Supp. 2d 236, 251 (S.D.N.Y. 2001) (finding that "denials of promotions and raises, criticism of a plaintiff's work performance, and alterations in, or an employee's dissatisfaction with, [his] responsibilities or assignments do not give rise to an inference of constructive discharge"). Therefore, plaintiff's negative 2011 evaluation also does not constitute an adverse employment action.

### iii. Placement on the May 8 PIP

Plaintiff also contends that being placed on the May 8 PIP constitutes an adverse employment action. The May 8 PIP gave plaintiff "the opportunity to attend classes on first time supervisors," noted that he would be "monitored on a monthly basis to track improvement," and stated that a "[l]ack of improvement will result in suspension, and/or termination." (*See* Merceica Decl. at Ex. F at NYHQ 055.)

---

*Hempstead*, 853 F. Supp. 2d 247, 269 (E.D.N.Y. 2012) (citing *Stetson v. NYNEX Serv. Co.*, 995 F.2d 355, 361 (2d Cir. 1993)).

As with negative evaluations, PIPs do not constitute a material change in the terms and conditions of employment unless they are accompanied by negative consequences in the employee's work conditions. *See Parinello v. Bausch & Lomb*, No. 10-CV-6519T, 2013 WL 1680152, at *9 (W.D.N.Y. Apr. 17, 2013) (finding that issuance of a PIP identifying problematic interpersonal behaviors was not an adverse employment action); *McGrath v. Thomson Reuters*, No. 10-CV-4944, 2012 WL 2119112, at *11 (S.D.N.Y. Apr. 30, 2012), *adopted by* 2012 WL 2122325 (June 12, 2012) (finding that the issuance of a PIP calling for plaintiff to record his activities and presenting discrete performance goals was not an adverse employment action); *Waters v. General Bd of Global Ministries*, 769 F. Supp. 2d 545, 558 (S.D.N.Y. 2011) (finding that a PIP that provided concrete steps for employee to meet expectations and improve performance was not an adverse employment action); *see also Brown v. American Golf Corp.*, 99 F. App'x 341, 343 (2d Cir. 2004) (finding that a PIP requiring an employee to attend several seminars was not an adverse employment action).[14]  Here, plaintiff provides no evidence of negative consequences arising as a result of the PIP.  The issuance of the May 8 PIP therefore does not constitute an adverse employment action.

### iv.  Constructive Discharge

Plaintiff argues that he was constructively discharged, which, if true, could give rise to an adverse employment action.  Constructive discharge occurs when an employee's "employer, rather than discharging him directly, intentionally creates a work atmosphere so intolerable that he is forced to quit involuntarily."  *Petrosino v. Bell Atlantic*, 385 F.3d 210, 229 (2d Cir. 2004).

---

[14] Plaintiff cites *Tse v. UBS Fin. Servs., Inc.*, for the proposition that a threat of termination, when combined with the imposition of new, burdensome conditions of employment, is sufficient to constitute an adverse employment action. 568 F. Supp. 2d 274, 290 (S.D.N.Y. 2008).  But the performance plan in that case presented explicit performance goals that the defendant conceded would be extremely difficult to meet. *Id.* at 289–90.  Here, the PIP merely provided plaintiff the opportunity to attend classes – the facts here therefore much more closely resembles those in *Brown* or the other cases cited than those in *Tse*.

The standard for constructive discharge is demanding – "a claim of constructive discharge must be dismissed as a matter of law unless the evidence is sufficient to permit a rational trier of fact to infer that the employer deliberately created working conditions that were so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." *Kader v. Paper Software, Inc.*, 111 F.3d 337, 341 (2d Cir. 1997).

Plaintiff claims that he felt he was forced to resign because of Mercieca's treatment of him. But the only purported evidence plaintiff offers in support of this claim is "the effect on [his] health," and the allegation that Mercieca "taunted" him by telling him that "the Hospital does not know what it is going to do with Mr. Smalls when the new employee starts." (Pl. Mem. in Opp'n at 22–23, citing Pl. Dep. at 197–98, 214.) This evidence is insufficient to sustain a claim that defendants intentionally created an intolerable working environment. *See Spence v. Maryland Casualty Co.*, 995 F.2d 1147, 1156 (2d Cir. 1993) (finding that "the fact that an employee develops stress-related ill health from the demands of his . . . position or from criticisms of his performance, and as a result determines that health considerations mandate his resignation, does not normally amount to a constructive discharge by the employer"); *Martin v. Citibank, N.A.*, 762 F.2d 212, 221 (2d Cir. 1985) (finding no constructive discharge claim where employee had unpleasant assignments and difficult relationship with supervisor but suffered no more than petty irritants); *see also Kader*, 111 F.3d at 339–41 (finding that "working under direct supervision of a person who was conducting a sexual relationship with [plaintiff's] wife" was not a "deliberate creation of working conditions" and was insufficient to sustain a constructive discharge claim).[15]

---

[15] As there is no valid constructive discharge claim here, plaintiff's claim for back pay must fail.

### v. May 12, 2011 Suspension

The last incident about which plaintiff complains is his one-day suspension in May 2011, resulting from the overpayment of C.W..[16]

"[T]he Second Circuit has not yet decided whether a one-day suspension without pay alone constitutes an adverse employment action," and district courts within the Circuit have come to different conclusions on the issue. *Martinez v. Connecticut, State Library*, 817 F. Supp. 2d 28, 41 (D. Conn. 2011). In *Satterfield v. United Parcel Serv., Inc.*, cited by plaintiff, the court found that plaintiff's one-day suspension arguably qualified as a materially adverse action because plaintiff presumably lost one day's worth of wages. No. 00-CV-7190, 2003 WL 22251314, at *10 (S.D.N.Y. Sept. 30, 2003).[17] However, that court did not determine that a one-day suspension *was* an adverse employment action – it simply assumed that it was before concluding that the plaintiff failed to meet the fourth prong of the *prima facie* case – establishing that the adverse action was taken because of the plaintiff's gender. *Id.* at *11.

Like the court in *Martinez*, this Court finds that the relevant facts here more closely resemble those present in *Dobrynio v. Cent. Hudson Gas & Elec. Corp.*, 419 F. Supp. 2d 557,

---

[16] Defendants argue that, under Title VII, any claim of discrimination based on the May 2011 suspension is time-barred, as more than 300 days passed between the suspension and plaintiff's filing of his EEOC charge on June 14, 2012. (Def. Mem. in Supp. (Doc. No. 45) at 13 n.2). Plaintiff does not dispute this assertion, responding only that the claim is not time-barred under the SHRL or the CHRL, and that the suspension may be considered in support of his retaliation claim. (Pl. Mem. in Opp'n at 13 n.3.) Under Title VII, plaintiff has therefore failed to identify an adverse employment action, and his federal discrimination claim cannot survive summary judgment. However, the Court retains the discretion to exercise supplemental jurisdiction over his SHRL and CHRL claims because they arise from the same facts and rely on the same evidence as his federal claims. *See* 28 U.S.C. § 1367(a); *Briarpatch Ltd., L.P. v. Phoenix Pictures, Inc.*, 373 F.3d 296, 308 (2d Cir. 2004). Supplemental jurisdiction is further warranted given the substantial resources already expended by the parties in developing and the Court in reviewing the factual record. *See Motorola Credit Corp. v. Uzan*, 388 F.3d 39, 56 (2d Cir. 2004). The Court will thus continue to analyze plaintiff's discrimination claims under the SHRL and CHRL.

[17] In *Lovejoy-Wilson v. NOCO Motor Fuel, Inc.*, cited by plaintiff and the *Satterfield* court, the Second Circuit held that a week-long suspension could constitute an adverse employment action where plaintiff lost a week's worth of wages. 263 F.3d 208, 223–24 (2d Cir. 2001). The *Martinez* court also cites *Cormier v. City of Meriden*, where a one-day suspension that also resulted in a one-year loss of eligibility for a premium was considered an adverse employment action. 420 F. Supp. 2d 11, 21 (D. Conn. 2006). The Court finds the factual circumstances in *Martinez* and *Dobrynio* resemble the instant action more closely.

564–65 (S.D.N.Y. 2006). As in those two cases, plaintiff here:

> did not suffer any other short term nor any long term consequences as a result of the suspension, nor did [he] suffer a material change in terms and conditions, benefits or responsibilities of [his] employment. Like *Dobrynio*, [plaintiff] returned after [his] one day off to the same job, the same position, the same title, the same duties, and the same salary.

*Martinez*, 817 F. Supp. 2d at 41. While plaintiff here differs from the plaintiffs in those two cases in that he did not choose a one-day suspension over an alternative sanction, the suspension still did not materially change the terms and conditions of his job.

The Court therefore finds that the one-day suspension here does not constitute an adverse employment action. Plaintiff has therefore not made out a *prima facie* case of discrimination under *McDonnell Douglas*, as required by Title VII and the SHRL.[18]

### 2. Inference of Discrimination

Even assuming that plaintiff did offer evidence of an adverse employment action, he does not provide any evidence that such an action occurred under circumstances giving rise to an inference of discrimination, and therefore does not make out a *prima facie* case of discrimination under the *McDonnell Douglas* scheme. *See Joseph*, 465 F.3d at 90. Even under the CHRL, plaintiff must show that discrimination played some role in the defendants' actions. In an effort to provide some evidence of discrimination, plaintiff cites comments made by Mercieca and differing treatment by defendants of Kwiath and plaintiff. (Pl. Mem. in Opp'n at 15.)

### i. Alleged Discriminatory Comments

Plaintiff argues that three comments Mercieca made raise an inference of discrimination: (1) using the phrase "you people" in a meeting with plaintiff and Kwiath in April 2012; (2)

---

[18] Because plaintiff does not establish that he suffered an adverse employment action, his discrimination claim under Title VII and the SHRL must fail. However, given the Court's exercise of supplemental jurisdiction over the CHRL claim, and the broad construction afforded that statute, the Court will continue with an analysis of whether there is any evidence of a discriminatory reason for defendants' treatment of plaintiff.

stating that plaintiff was "in cahoots" with the African-American employee who received excessive overtime; and (3) saying "let's call a spade a spade" sometime in 2009 or 2010. (*Id.*) But these remarks fail to support any inference of discrimination.

When considering specific comments as evidence of discrimination, courts consider: (1) who made the remark; (2) when the remark was made in relation to the employment decision at issue; (3) the content of the remark (i.e. whether a reasonable juror could view the remark as discriminatory); and (4) the context in which the remark was made. *See Henry v. Wyeth Pharm., Inc.*, 616 F.3d 134, 150 (2d Cir. 2010).

No reasonable juror could view any of the alleged remarks as discriminatory. None are plainly discriminatory and all three are normal phrases used in common parlance. Without additional context, which plaintiff cannot provide, none of the comments gives rise to evidence of discriminatory animus. Plaintiff does not even pinpoint the year in which Mercieca said "let's call a spade a spade," much less provide context showing the remark was discriminatory.[19] (Pl. Dep. at 160.) Depending on the context, the "you people" comment could be discriminatory, and plaintiff argues that Mercieca meant "you [black] people." (Pl. Mem. in Supp. at 16; Pl. Dep. at 138). But plaintiff testified that Mercieca made the comment in a meeting where only he and Kwiath were present. (Pl. Dep. at 136–38.) Kwiath is white. Plaintiff also testified that she did not use the word "black," and did not further explain why he understood the comment to be discriminatory. (Pl. Dep. at 138.) "[A] plaintiff's subjectively held belief that comments are discriminatory is insufficient to support an inference of discrimination." *Desir v. Board of Co-op. Educ. Servs. (BOCES) Nassau Cnty.*, 803 F. Supp. 2d 168, 179 (E.D.N.Y. 2011) (citing

---

[19] While there is no requirement that plaintiff state a *prima facie* case required for a plaintiff to defeat summary judgment on a claim under the CHRL, the Court finds *Lane v. Sotheby Parke Bernet, Inc.* instructive. 758 F.2d 71, 72–73 (2d Cir. 1985). There, the Second Circuit affirmed that this same phrase failed to establish a *prima facie* case of discrimination.

*Grady v. Affiliated Cent., Inc.*, 130 F.3d 553, 561 (2d Cir. 1997)).

The comment that plaintiff was "in cahoots" with C.W., another African-American employee, could also be discriminatory depending on its context. But again, plaintiff provides none. He does not dispute that he and C.W. were friendly and had known each other for more than five years, (Pl. Rule 56.1 Counter Statement at ¶ 46), that Mercieca saw them working in the ambulance base after C.W.'s shift had ended, (*id.* at ¶ 38), or that, when Merceica confronted him about C.W.'s payroll records after her investigation, he told her that he had not reviewed the records because he was "too busy," and that a lot of employees were likely overpaid, (*id.* at ¶ 40–41). The word "cahoots" is devoid of any apparent race-related connotation, and simply means "in partnership; in league," or "colluding or conspiring together secretly." *See* Dictionary.com, http://www.dictionary.reference.com/browse/cahoots?s=t (last visited Aug. 12, 2015); Merriam-Webster.com, http://www.merriam-webster.com/dictionary/cahoots (last visited Aug. 12, 2015); *see also* Oxford Dictionaries, http://www.oxforddictionaries.com/us/definition /american_english/cahoots (last visited Aug. 12, 2015). Given the relevant undisputed facts, this comment, like those discussed above, cannot give rise to an inference of discrimination, nor does it establish that discrimination played any role in defendants' actions.

### ii. Disparate Treatment

Plaintiff also argues that defendants treated him less favorably than Kwiath, who is white, by unfairly dividing their responsibilities and by treating them differently following the April 2012 scheduling error, and that such treatment gives rise to an inference of discrimination.[20]

---

[20] Plaintiff briefly mentions that Kwiath was never suspended, but does not argue that this was an example of disparate treatment. (*See* Pl. Mem. in Opp'n at 18.) Nor could he. Plaintiff was suspended for unauthorized overtime payments, which he admitted he was "too busy" to review. (Pl. Rule 56.1 Counter Statement at ¶ 41.) He admits that he had "the sole responsibility of preparing payroll," (Pl. Mem. in Opp'n at 12), and there is no evidence that Kwiath was involved in this task.

"A plaintiff may establish a claim of disparate treatment under Title VII either (1) by showing that he has suffered an adverse job action under circumstances giving rise to an inference of discrimination on the basis of race, or (2) by demonstrating that harassment on one or more of these bases amounted to a hostile work environment." *Hyek v. Field Support Servs., Inc.*, 702 F. Supp. 2d 84, 92 (E.D.N.Y. 2010) (citing *Feingold v. New York*, 366 F.3d 138, 149 (2d Cir. 2004)).  A claim of disparate treatment focuses on "how an individual was treated compared to [his] similarly situated coworkers." *Smith v. Xerox Corp.*, 196 F.3d 358, 370 (2d Cir. 1999), *overruled on other grounds by Meacham v. Knolls Atomic Power Lab.*, 461 F.3d 134, 141 (2d Cir. 2006)).  The individual with whom plaintiff attempts to compare himself "must be similarly situated in all material respects." *See Nurse v. Lutheran Med. Ctr.*, 854 F. Supp. 2d 300, 312 (E.D.N.Y. 2012) (citing *Shumway v. United Parcel Serv., Inc.*, 118 F.3d 60, 64 (2d Cir. 1997)).  Here, plaintiff's claims of disparate treatment fail to give rise to an inference of discrimination based on race because the record contains no evidence that plaintiff was treated unfairly and because plaintiff and Kwiath were not similarly situated in all material respects.

Spending an extra, in plaintiff's words, "few hours each week" managing payroll does not constitute unfair treatment.  (Pl. Mem. in Supp. at 12.)  Plaintiff admits that while he was responsible for payroll and inventory, Kwiath was primarily responsible for statistics and unit activity logs, and the two shared responsibility for scheduling and narcotics paperwork.  (Pl. Rule 56.1 Counter Statement at ¶ 28.)  Each was primarily responsible for certain tasks that the other was not.  Such a division of responsibilities does not strike the Court as materially unequal, much less unfair.  "Quite simply, not every action of an employer, viewed as unfavorable by an employee who has filed a charge of [race] discrimination, becomes actionable under the rubric of disparate treatment." *Crew v. Trustees of Columbia Univ.*, 452 F. Supp. 2d 504, 530 (S.D.N.Y.

2006) (citing *Phillips v. Bowen*, 278 F.3d 103, 117 (2d Cir. 2002)).

Although there is record evidence that both plaintiff and Kwiath were Assistant Supervisors in the EMS Department, reported to the same supervisor, and were subject to the same workplace standards, an examination of the circumstances surrounding the April 2012 scheduling issue reveals that they were not, in fact, similarly situated "in all material respects." *Nurse*, 854 F. Supp. 2d at 312 (citing *Shumway*, 118 F.3d at 64). First, both plaintiff and Kwiath faced consequences as a result of the error – Kwiath received a verbal warning and a notation in his evaluation, while plaintiff was put on a PIP to improve his supervisory skills, which contained a warning that a lack of improvement could lead to suspension or termination. (*See* Pl. Rule 56.1 Counter Statement at ¶ 63; Mercieca Decl. at Ex. F at NYHQ 054-55.) As a preliminary matter, the Court does not find these consequences to be materially different. The record evidence also demonstrates that Kwiath had served as an Assistant Supervisor since 2005, while plaintiff's promotion to the position was in 2009. Moreover, the record demonstrates that plaintiff had additional performance issues, which Kwiath did not (Pl. Rule 56.1 Counter Statement at ¶¶ 49–52), and that some of plaintiff's previous PIPs had contained notations regarding his issues with scheduling, while there is no evidence that Kwiath had prior scheduling problems. (*See* Orlando Decl. at Ex. H, Ex. I.) Plaintiff and Kwiath therefore were not similarly situated in all material respects, and plaintiff's disparate treatment claim must fail.

Plaintiff has failed to provide evidence that he suffered an adverse employment action, and there is no evidence that any such action occurred under circumstances giving rise to an inference of discrimination. As a result, plaintiff fails to make out a *prima facie* case of discrimination under the *McDonnell Douglas* scheme. Furthermore, for the reasons stated above, plaintiff cannot show that discrimination played any role in defendants' actions, and no

jury could find the defendant liable of race discrimination here.  Because plaintiff is unable to raise a triable issue of fact, summary judgment is appropriate as to plaintiff's discrimination claims under Title VII, the SHRL, and the CHRL.

### 3. **Hostile Work Environment**

Plaintiff's claim of a hostile work environment fails for similar reasons.[21]  To establish a hostile work environment under Title VII or the SHRL, plaintiff must show: "(1) that the harassment [was] sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, and (2) that a specific basis exists for imputing the objectionable conduct to the employer."  *Alfano v. Costello*, 294 F.3d 365, 373 (2d Cir. 2002).  Plaintiff must demonstrate that "under the totality of the circumstances, the workplace was so severely permeated with discriminatory intimidation, ridicule, and insult that the terms and conditions of her employment were thereby altered."  *Lawson v. City of New York*, No. 10-CV-5238 (RJD) (CLP), 2013 WL 6157175, at *14 (E.D.N.Y. Nov. 22, 2013), *aff'd*, 595 F. App'x 89 (2d Cir. 2015).

Plaintiff cannot meet this burden.  The only evidence plaintiff cites of harassment is the three comments addressed above – all of which are facially race-neutral and lack any context through which one could infer that they were discriminatory.  He argues, for the first time in his opposition papers, that Mercieca "was verbally abusive and aggressive toward plaintiff, yelled at him and banged her first on the table during meetings with him."  (Pl. Mem. in Opp'n at 20.)  However, even in combination with the aforementioned remarks, these incidents are not severe or pervasive enough to meet the standard for a hostile work environment claim under Title VII or

---

[21] Title VII and SHRL hostile work environment claims are analyzed under the same standard.  *See Russo v. New York Presbyterian Hosp.*, 972 F. Supp. 2d 429, 449 (E.D.N.Y. 2013) (citing *Summa v. Hofstra Univ.*, 708 F.3d 115, 123–24 (2d Cir. 2013)).

the SHRL. *See, e.g.*, *Hahn v. Bank of America Inc.*, No. 12-CV-4151, 2014 WL 1285421, at *23 (S.D.N.Y. Mar. 31, 2014) (finding eight incidents where manager berated employee, including yelling and screaming at her in front of co-workers, to be insufficient to defeat summary judgment); *Davis-Bell v. Columbia Univ.*, 851 F. Supp. 2d 650, 671–74 (S.D.N.Y. 2012) (finding that nine incidents over four years, including an employee's claims of being cursed and yelled at, were not severe or pervasive enough to sustain a hostile work environment claim); *De La Concha v. Fordham Univ.*, 5 F. Supp. 2d 188, 190 (S.D.N.Y. 1998) (finding supervisor's racially offensive comments, including use of the word "spic," insufficient to withstand summary judgment on a hostile work environment claim), *aff'd*, 173 F.3d 843 (2d Cir. 1999).

Plaintiff's claim also fails under the CHRL, even though that statute does not impose a "severe or pervasive" bar. *Lawson*, 2013 WL 6157175, at *14. The CHRL is not meant to be interpreted as a "general civility code." *Fleming v. MaxMara USA, Inc.*, 644 F. Supp. 2d 247, 268 (E.D.N.Y. 2009). Under the CHRL, plaintiff must still link an adverse employment action to a discriminatory motivation. *Lawson*, 2013 WL 6157175, at *14 (citing *Williams*, 872 N.Y.S.2d 27). Where, as here, plaintiff fails to do so, defendants' motion for summary judgment must be granted.

### C. Retaliation Claims Under Title VII, SHRL, and CHRL

Title VII and SHRL retaliation claims are also analyzed according to the framework set forth in *McDonnell Douglas*, and are "evaluated identically." *Shah v. MTA New York City Transit Auth.*, No. 12-CV-4276 (ERK) (RLM), 2015 WL 4139293, at *23 (E.D.N.Y. July 9, 2015). Plaintiff must establish a *prima facie* case of retaliation by showing: "(1) [he] engaged in protected activity; (2) the employer was aware of this activity; (3) the employee suffered a materially adverse employment action; and (4) there was a causal connection between the alleged adverse action and the protected activity." *Kelly v. Howard I. Shapiro & Assoc.*

*Consulting Engineers, P.C.*, 716 F.3d 10, 14 (2d Cir. 2013) (per curiam) (internal citation omitted); *see also Quarless v. Brooklyn Botanic Garden Corp.*, No. 11-CV-5684 (CBA) (RER), 2014 WL 2767085, at *11 (E.D.N.Y. June 18, 2014). "Protected activity" refers to action taken to protest or oppose statutorily-prohibited discrimination. *See Benn v. City of New York*, 482 F. App'x 637, 638 (2d Cir. 2012) (citing *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 566 (2d Cir. 2000)). The protected activity alleged "must involve some sort of complaint about a type of discrimination that Title VII forbids." *Santucci v. Veneman*, No. 01-CV-6644, 2002 WL 31255115, at *3 (S.D.N.Y. 2002) (citing *Brands-Kousaros v. Banco Di Napoli S.P.A.*, No. 97-CV-1673, 1997 WL 790748, at *5 (S.D.N.Y. Dec. 23, 1997)).

In addition to plaintiff's inability to establish that he suffered an adverse employment action, discussed at length above, plaintiff has not shown that he engaged in protected activity that defendants were aware of.

He points to two separate instances where he complained about defendants' conduct while he was employed at the Hospital.[22] First, he claims that he complained about Mercieca's conduct to Orlando on May 11, 2012. However, he testified that he "can't remember the details of the conversation," and there is no evidence that he ever told Orlando that such conduct was discriminatory. (Pl. Dep. at 125, 128–30, 155.) Without giving her more details allowing her to understand that he was complaining of unlawful conduct, plaintiff's criticism of perceived unequal treatment is not sufficient to show that the employer was aware that his opposition was directed at unlawful conduct. *See Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 292 (2d Cir. 1998).

---

[22] Plaintiff also mentions submitting his Charge of Discrimination to the EEOC on June 14, 2012. (Pl. Mem. in Opp'n at 21.) However, plaintiff does not dispute that the Hospital did not receive notice of this Charge until September 2012, after plaintiff's last day of work. (Pl. Rule 56.1 Counter Statement at ¶¶ 101–02.) It therefore cannot serve as the basis for a claim of retaliation.

Plaintiff also claims that he complained to Dr. Walderon and Dr. Sixsmith about Mercieca saying he was "in cahoots" with C.W. But again, plaintiff provides no evidence that he told the doctors he was being discriminated against, no evidence that they would have understood him to be complaining of discrimination, and no evidence that the Hospital was aware of his complaints. In fact, when asked whether he told the doctors he believed he was being discriminated against because of his race, plaintiff testified "I don't recall me saying that." (Pl. Dep. at 231.) Plaintiff therefore fails to show that he engaged in protected activity that the Hospital was aware of, and his retaliation claim under Title VII and the SHRL cannot survive.

Under the CHRL, a plaintiff "must show that [he] took an action opposing [his] employer's discrimination and that, as a result, the employer engaged in conduct that was reasonably likely to deter a person from engaging in such action." *Quarless*, 2014 WL 2767085, at *11 (citing *Mihalik*, 715 F.3d at 112); *see also Gorokhovsky v. N.Y.C. Housing Auth.*, 552 F. App'x 100, 102 (2d Cir. 2014). Summary judgment is only appropriate under this statute "if the plaintiff cannot show that retaliation played any part in the employer's decision." *Id.* (citing *Mihalik*, 715 F.3d at 116). However, "a plaintiff claiming retaliation must still show that [his] employer was aware [he] engaged in a protected activity, and that there was a causal connection between the protected activity and the employer's subsequent action." *Taylor v. Seamen's Soc. For Children*, No. 12-CV-3713, 2013 WL 6633166, at *23 (S.D.N.Y. Dec. 17, 2013) (citing *Pilgrim v. McGraw-Hill Cos.*, 599 F. Supp. 2d 462, 469 (S.D.N.Y. 2009); *Dixon v. Int'l Fed'n of Accountants*, 416 F. App'x 107, 110 n.1 (2d Cir. 2011).

For the reasons stated above, plaintiff cannot show that he took an action opposing the defendants' discrimination, that the Hospital was aware of his complaint of discrimination, or that there existed any causal connection between his action and the Hospital's treatment of him.

In other words, he has demonstrated no evidence that "links [his] complained-of [treatment] to a retaliatory motivation." *Quarless*, 2014 WL 2767085, at *11; *see Wilcox v. Cornell Univ.*, 986 F. Supp. 2d 281, 288 (S.D.N.Y. 2013) (citing *Williams*, 872 N.Y.S.2d at 35). Therefore his retaliation claim under the CHRL fails, and defendants' motion for summary judgment on all three of plaintiff's retaliation claims is granted.

### D. <u>Aiding and Abetting</u>

Where no violation of the SHRL by an employer has been established, an individual employee cannot be held liable for aiding or abetting such a violation. *See White v. Pacifica Foundation*, 973 F. Supp. 2d 363, 377 (S.D.N.Y. 2013); *Virola v. XO Commc'ns, Inc.*, No. 05-CV-5056 (JG) (RER), 2008 WL 1766601, at *20 (E.D.N.Y. Apr. 15, 2008); *Strauss v. N.Y. State Dep't of Educ.*, 805 N.Y.S.2d 704 (3d Dep't 2005). As plaintiff is unable to establish that the Hospital violated the SHRL, his claim against Mercieca fails as a matter of law.

## CONCLUSION

For the reasons set forth above, the court finds that there are no genuine issues of material fact, and defendants are entitled to judgment as a matter of law. Defendants' motion for summary judgment is therefore GRANTED. The Clerk of Court is directed to enter judgment accordingly and close the case.

SO ORDERED.

*Roslynn R. Mauskopf*

Dated: Brooklyn, New York
      September 15, 2015

_____
ROSLYNN R. MAUSKOPF
United States District Judge